UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.                                                          **DECISION AND ORDER**
                                                            10-CR-184S

ANTONIO BRIGGS, et al.,

        Defendants.

1.      Defendant Damian Ard is one of 24 defendants charged with various cocaine related charges in this multi-count, Third Superseding Indictment. Discovery in this case began in the fall of 2010. Its serpentine path has lead to the motion presently before this Court: Ard's objections to the Honorable Hugh B. Scott's Report and Recommendation, which, in short, advises this Court to deny Ard's motion for discovery-related sanctions against the Government.[1] For the following reasons, Judge Scott's decision is adopted in accordance with this Order.

2.      Although the procedural background of this case is laid out in Judge Scott's Report and Recommendation and familiarity therewith is presumed, a summary of this topic remains necessary.

3.      Pursuant to various wiretap orders, the Government has amassed a large amount of information pertaining to the phone numbers associated with the Defendants in this case. To collect and collate these data, the Government uses a system called VoiceBox. Ard contends that this system produces user-friendly data. That is, data in spreadsheet form that can be easily managed, searched, sorted, and organized. But the Government's initial voluntary discovery did not provide the data in this format. As such,

---

[1] As noted in the Report and Recommendation, several other defendants joined Ard's motion.

Ard's attorney, on behalf of the other defendants, requested the data in its native, user-friendly format.

4. Initially, the Government represented that it could not produce the data in the desired format and that in instances where it had in the past, the data came from the FBI, not the DEA, which was the agency that conducted the investigation here. Although the FBI also uses VoiceBox, the Government represented that the DEA used a different verison of the software.

The Government then checked with the DEA and was told that it "does not have the capacity to produce a report of the type" requested by Defendants. (Docket No. 164.) Ard disputed this contention, and several months elapsed with the Government investigating the capabilities of the VoiceBox system. On April 15, 2011, the Government provided further discovery materials, including "minimization data" and a disc with "voluminous" discovery. Although still not searchable, the data were in spreadsheet form. Accordingly, the defense draws the conclusion that the Government apparently did have this capability all along. Yet the Government provides no explanation for the discrepancy between its current production and its former representation that the DEA's system was not capable of producing spreadsheets.

5. The defense objected further still. Comparing the spreadsheets that it received here to those that the Government has produced in the past (ostensibly from the FBI), Ard contended that the data had been intentionally manipulated to render the data "useless" to the defense. Indeed, the output from the April 15 production was still not searchable and was in a low resolution format. Curiously, the layout of the previous disclosures from the FBI's system and the disclosures here was exactly the same. The only

differences were in quality and ability to manipulate. Ard proffers an explanation for this discrepancy: he believes the two systems are in fact the same. He contends that the data here were printed from the VoiceBox system, scanned back into digital format, and only then turned over. This process would lower the quality of the documents and remove the ability to search or otherwise manipulate the data. Of course, the data could be re-converted into a usable format. But this would take either manual entry or the expense of a third-party vendor.

6. In response to these concerns, Judge Scott issued a comprehensive discovery Order on September 8, 2011. Noting the lack of guidance from the Federal Rules of Criminal Procedure regarding the discovery of Electronically Stored Information ("ESI"), and the relatively nascent aspect of this issue in criminal proceedings, the court laid down the following rule for this case: "The Government is either to reproduce its disclosure in a searchable format (PDF, for example ) or in the native format, indicating the manner of that reproduction." (Docket No. 291, at 14) (parenthesis in original). Judge Scott concluded, "[T]he Government is to bear the burden of reproducing these ESI materials in a fashion that defendants can retrieve and manipulate as discussed in this Order." (Id., at 17.)

7. In an effort to comply with this Order, on September 29, 2011, the Government provided four discs of data in PDF, searchable format. In an affidavit submitted the following month, on October 11, 2011, the Government indicated that it "believes that the discovery in the September 29, 2011 correspondence fully complies with Magistrate Judge Scott's order insofar as wiretap pleadings, reports of investigation, and other items of discovery, are concerned. The government . . . is in the process of

determining the method of compliance with the order insofar as the Voicebox data is concerned. Those efforts continue." (Docket No. 319, at ¶ 3.)

8. This did not satisfy Defendants. The data, according to them, was still not capable of manipulation and could not be exported to create new files. It was also missing text messages and minimization data. Further, the defense contends that there was no need to engage in any "process" to determine the "method of compliance" – all the government had to was turn over the data in its native format.

9. The dispute continued, and the defense moved to amend or correct the September 8, 2011 Order to reflect what it thought should have been required of the Government. At oral argument on this motion, the Government, for the first time, asserted that it was concerned about possible data corruption if the data were turned over in the form requested by defendants. In other words, if the data were tuned over in a format that could be manipulated, that data might be lost or altered.

10. Thereafter, Judge Scott again issued a comprehensive Order, this time denying the defense's motion to amend or correct the previous Order. Judge Scott found that: (1) The Government need not compile data in the form requested by Defendants; (2) the Government need not produce data using functions such as issue tagging, sticky notes, data fields, and unitization; and (3) the Government need not produce the data in its native format. That decision was appealed to, and affirmed by this Court. (See Docket No. 436.)

11. A few months after that Order, the Government informed Judge Scott, in a letter dated January 4, 2012, that it believed it had complied with the Order via its September 29, 2011 production. Again raising the prospect of corruption, it also noted that:

4

> As previously set forth to the Court, the government has undertaken to determine whether the Voicebox data can be exported from Voicebox to Excel, or some other software, for discovery purposes, with the following functionality: so that defense counsel can perform various manipulations of the data, e.g., searching it, sorting or filtering it, and summing its numerical portions, while "locking" the data so the data cannot be changed. This letter is submitted to inform the Court that a solution has not been found that meets both goals.

(Docket No. 481, attached as Ex. A.)

The Government concluded, "Because the Voicebox data has been disclosed in a searchable pdf format, the government deems that it has satisfied its discovery obligation and complied with the Court's orders with respect to the Voicebox data." (Id.)

12. Of course, the Defense resoundingly objects to this representation. The Defendants believe that the Government has failed to comply with Judge Scott's Orders and is now inserting a requirement – that the data be locked – where none was before. This contention leads directly to the objections currently before this Court. Arguing that the Government has deliberately delayed discovery and has refused to comply with Judge Scott's Order, Defendants Ard, and those joining him, seek numerous sanctions, namely (1) suppression of the wiretap evidence; (2) release from custody; (3) dismissal of the indictment under the Speedy Trial Act; (4) disqualification of the United States Attorney; and (5) costs and fees associated with the motion.

Judge Scott advised this Court to deny the motion in its entirety. Objections to that Report and Recommendation are now before this Court.

13. In short, and in accordance with this Decision, that Recommendation is adopted. This is so, at least in part, because the objections hinge in large measure on what the Defendants perceive to be the Government's refusals to comply with Judge Scott's

discovery Order. But in denying the motion for sanctions, Judge Scott found that the Government has sufficiently complied with the discovery Order that he issued. This Court finds no clear error in that decision. See, e.g., Am. Dream Enterprises Corp. v. Mana Products, Inc., No. 06-CV-3354 FBRML, 2009 WL 1291561, at *2 (E.D.N.Y. May 8, 2009) ("A district court will not reverse a magistrate judge's ruling on a discovery motion unless it is 'clearly erroneous' or 'contrary to law'"); 28 U.S.C. § 636(b)(1)(A).

14. Although it is adopting the Report and Recommendation, this Court feels compelled to separately address some issues it finds troubling.

First, Ard is not shy in rebuking the conduct of the United States Attorney's Office in this case. Indeed, he calls for personal sanctions, and the total disqualification of the United States Attorney's Office. He emphatically accuses that Office of engaging in gross misrepresentation, gamesmanship, and tactics meant to intentionally delay the proceedings. He points to what he considers a litany of excuses and, frankly, lies offered by the Government in the course of discovery. For instance, at the start of ths dispute, the Government insisted that it could not produce the reports in spreadsheet form. Then later, it did just that. But it provided no explanation for the delay and the change in opinion. Months later, it suggested that the discovery, as requested by the Defendants, was subject to privilege. Later still, it concluded that to produce the data as the Defendants wished would sacrfice its integrity and subject the data to corruption.

Ard contends these explanations are mere "ruses" meant to delay or eliminate meaningful discovery, frustrate the defense, and force unwitting pleas.

15. It goes without saying that these accusations, aimed at the heart of our profession's ethical standards, are taken seriously by this Court. Ard has certainly

6

highlighted issues that raise this Court's suspicion. But the evidence does not necessarily suggest that the Government has deliberately delayed discovery, or that it has harbored malicious intent in the course of discovery. As noted by Judge Scott, the standards relating to the production of ESI in criminal cases in this District and in this Circuit are not yet fully developed. It was not until September of 2011, with Judge Scott's Order, that any clear guidepost had been set for this case. Shortly thereafter, the Government produced the data in PDF format. As evidenced by the Government's October 11, 2011 affidavit – stating that it was "in the process of determining the method of compliance" – the Government was clearly not yet certain whether its September 29 submission was sufficient. It later came to the conclusion that it was. And Judge Scott ultimately agreed. This is not, in itself, sanctionable conduct.

16. Ard sees malfeasance at every turn, but all parties must be cognizant that the standards guiding discovery such as this are in their infant stages. (Even Ard resorts to a comparison with civil caselaw.) That is not to excuse misconduct, but, it should offer perspective. And with that perspective, this Court finds that after undertaking a *de novo* review of the motion,[2] in accordance with Judge Scott's Report and Recommendation, sanctions are not warranted here. This case should, however, serve as notice to the Government that this Court will not hesitate to scrutinize the Government's ESI discovery procedures to ensure responsiveness and fairness.

17. Finally, Attorney Mark J. Mahoney's submissions in this case require some

---

[2] Because the motion for sanctions calls for dispositive relief (e.g., evidence preclusion), the review is properly *de novo*. 28 U.S.C. § 636(b)(1)(B). This is not to be confused with the above ruling regarding discovery, with its attendant clear error review. Although the two issues are somewhat intertwined – Defendants call for sanctions due to alleged discovery failings – the standards of review must remain separate.

7

comment. Indeed, this case unfortunately exemplifies the pitfalls of an adversarial system. In criticizing the Government for alleged failures and misrepresentations, Attorney Mahoney often straddles the line between advocacy and misrepresentation himself. To pick but one example from the more than 100 pages of argument he dedicates to this issue, Attorney Mahoney states that the Government "ultimately announced, on January 4, 2012, that it *would not* comply" with Judge Scott's Order. (Docket No. 481, at 27) (emphasis in original). Of course, this is not true. The "refusal" to which Attorney Mahoney refers is found in the Government's January 4 letter, wherein the Government informs Judge Scott that it believes that, by providing the data in searchable format, it has "discharge[d] the government's discovery obligations." This is by no means the blatant refusal to comply with an Order that Attorney Mahoney makes it out to be. While it could be *argued* that the Government was in effect refusing to obey the Order, such cannot be *stated as fact*. Representations like that, especially when compounded and combined with unnecessarily verbose submissions, only serve to confuse, rather than enlighten. What is more, Attorney Mahoney's language is often overwrought, incendiary, and accusatory – he is quick, for example, to charge Judge Scott with bias in favor of the government. (See Docket No. 481, at 11.)

Mr. Mahoney calls for sanctions against the Government. This Court has found them unwarranted as of yet, but has placed the Government on notice. Identical notice extends to Mr. Mahoney, and this Court will not hesitate to act if necessary.

****

IT HEREBY IS ORDERED, that, in accordance with this Decision and Order, this Court accepts and adopts Judge Scott's Report and Recommendation, which was issued on August 10, 2012 (Docket No. 466) and corrected on August 29, 2012 (Docket No. 470).

FURTHER, that Ard's Objections to the Report and Recommendation (Docket No. 481), are DENIED.

FURTHER, that the Motion for Sanctions (Docket Nos. 416, 418) filed by Ard and joined by several other Defendants is DENIED.

Dated:     November 16, 2012
              Buffalo, New York

                                              /s/William M. Skretny
                                              WILLIAM M. SKRETNY
                                                    Chief Judge
                                              United States District Court